Filed 6/29/26  P. v. Kindrick CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)


| | |
|---|---|
| THE PEOPLE,<br>        Plaintiff and Respondent,<br><br>        v.<br><br>WILLIAM KINDRICK,<br>        Defendant and Appellant. | C103274<br><br>(Super. Ct. No. 22FE015275) |


Defendant William Kindrick requested mental health diversion pursuant to Penal Code section 1001.36.[1]  The trial court denied the request, finding defendant posed an unreasonable risk of danger to public safety if treated in the community.  Defendant then pled no contest to unlawful possession of a firearm.  The court suspended imposition of sentence and placed defendant on formal probation for two years conditioned upon his serving 270 days in county jail.  On appeal, defendant argues the trial court abused its discretion in denying his diversion request.  We disagree and affirm the judgment.

---

[1] Undesignated statutory references are to the Penal Code.

1

## FACTUAL AND PROCEDURAL BACKGROUND[2]

On September 11, 2022, Vladislav R. reported to police that he was driving from the Sacramento River to his home in Carmichael when his car was hit by another car.[3] He followed the other car to a mobile home park to obtain license and insurance information. When he pulled up to the home, an old man came out with a chain and started to hit Vladislav R.'s car. Vladislav R. grabbed the chain and put it in his trunk. A younger man started to hit Vladislav R.'s car with a bat. The old man went inside and came back out with an automatic weapon and fired 9 to 12 shots above Vladislav R.'s head. Vladislav R. identified defendant as "the 'insane' man" who fired at him. Vladislav R. stood in front of the old man and said, "kill me, kill me," and the old man said "no" and fired about Vladislav R.'s head. The young man also came out with a shot gun and fired over Vladislav R.'s head.

Victor R. told police he was a passenger in the car driven by his brother, Vladislav R. When they were leaving the parking lot, there was a car in front with a boat on top that was braking and accelerating and swerving in between lanes. Vladislav R. followed them home because he wanted to get their information and ask about their behavior. One man got a bat and broke their taillight. Another man was swinging a chain. Vladislav R. pulled the chain out of his hands and put it in the trunk. One of the men fired an automatic weapon above their heads about six times. The other man fired another weapon about three to five times. Victor R. identified defendant as the older man who shot at them and C.P. as the young man who had a chain, broke their taillight, and also shot at them.

---

[2] We derive the relevant factual background from police reports, which defendant cites in his opening brief.

[3] Russian is the first language of Vladislav R. and Victor R. They spoke to police using an online interpreter.

Defendant initially told police he heard the occupants of a white Prius yelling and then heard gunshots. He did not see who was shooting but the Prius followed him home. When he went inside to use the restroom, his passenger got out and said something. After being detained, defendant stated he was coming back from Discovery Park and a white Toyota kept following him. Defendant said he did not know why because there was no collision between the vehicles. The pursuers attacked his friend. Defendant came out of his home with a BB gun and told the pursuers to leave. Defendant heard shots fired but did not know from where or anything else about it. Defendant stated, "I don't have any firearms," but advised that there were loose shotgun shells on the floorboards of his car. Multiple 12 gauge shotgun shells were found on the floorboards, in the driver's door pocket, and in the center console of the car.

C.P. initially told a police officer he heard fireworks but did not see or hear anything else. After being detained, C.P. stated that a car was "riding [their] ass" coming back from Discovery Park. When they got home, C.P. got a chain out and was holding it to deter the pursuers. C.P. was attacked by the pursuers who took the chain. A police officer observed injuries to C.P.'s back and blood on his left nostril. When the pursuers struck C.P.'s wife, C.P. took a bat from them and hit their car. C.P. heard "bang, bang, bang" but did not see a gun.

Multiple third party witnesses interviewed by police stated they heard three to six gun shots. One woman who called 911 stated "there was probably at least three gunshots" and "it sounded like it might have been an automatic weapon."

Gunshot residue tests for defendant and C.P. were presumptively positive. A search of defendant's home located dozens of rounds of ammunition of various calibers, along with a shotgun, a bolt action rifle, and a rifle scope.

In March 2023, a complaint deemed an information charged defendant with two counts of assault (§ 245, subd. (a)(2); counts one & three), discharging a firearm in grossly negligent manner (§ 246.3; count five), two counts of unlawfully possessing a

3

firearm (§ 29805; count six & seven), and unlawfully possessing ammunition (§ 30305, subd. (a)(1); count eight).[4] As to counts one and three, the information alleged that defendant personally used a firearm (§§ 12022.5, subd. (a), (d)).

In July 2024, defendant requested mental health diversion under section 1001.36. Defendant attached a photograph of a one-page, mental diversion treatment plan form dated April 16, 2024 and signed by J.K. of Advanced Psychiatry Associates. While this document is crumpled and difficult to read, it appears to state that defendant suffers from ADHD, bipolar disorder, intermittent mania, and debilitating depression. Defendant's symptoms include inability to fully care for himself, impulse control problems, insomnia, panic attacks, poor appetite, and anxiety. The document states these symptoms would respond to a treatment plan that includes keeping in touch with this provider and attending groups. The plan recommended that defendant needed a calming environment, medical management, adherence to scheduled appointments, and group and individual therapy. Defendant's request also attached a number of support letters and emails attesting to defendant's character and good works, and in the case of two letters, that the arrest and prosecution triggered his depression. One email stated, "I have seen William and the way he deals with stressful situations and wish that I could handle them the way he does."

In October 2024, the People filed an opposition arguing defendant is ineligible and/or unsuitable for mental health diversion and attaching police reports of the current incident and defendant's prior convictions.

On November 19, 2024, the trial court conducted a hearing on defendant's request for mental health diversion. At the outset of the hearing, the court stated it had reviewed

---

[4] Counts two and four charged C.P. with assault and count five jointly charged C.P. and defendant with grossly negligent discharge of a firearm. After the preliminary hearing, the trial court dismissed the counts against C.P.

4

defendant's mental health diversion request and exhibits, as well as the prosecution's opposition and exhibits.

Defense counsel presented the court with a copy of an October 2024 mental diversion treatment plan from Turning Point CORE Rosin (which is not part of the record on appeal). Counsel argued that the underlying facts of the incident indicated that defendant's symptoms, including impulse control, panic attacks and anxiety, led to an inappropriate response to the incident. Defense counsel maintained the facts bordered on self-defense but if defendant was guilty it was the result of mental disorder. Further, defendant was not likely to commit a super strike as evidenced by the fact that he had been out of custody for two years and no new offenses had occurred. Counsel compared the situation to *People v. Moine* (2021) 62 Cal.App.5th 440. Further, defendant's criminal history was minimal, consisting of four misdemeanors. Defense counsel also pointed out that the witness statements of the victims were inconsistent and one third party witness stated that she heard warning shots fired and a woman screaming for help. Counsel stated these facts were "exactly on point" with *People v. Whitmill* (2022) 86 Cal.App.5th 1138 (*Whitmill*). Defendant's position was that the gun used was an airsoft gun and the gun found in his home was a nonfunctioning antique.

Defense counsel characterized the encounter as a "road rage incident" that did not involve a collision. When the victims chased defendant to his home where women and children were present, defendant was scared to death. Counsel argued that, if defendant's actions were inappropriate and criminal, it was directly related to his mental health issues. Counsel advised the court that defendant was doing well with his current provider and his case manager had expressed willingness to come to court and advocate for mental health diversion.

The prosecutor argued there was no proof in the police reports that defendant was experiencing any symptoms of ADHD, bipolar disorder, intermittent mania or depression at the time he committed the offenses. This was a road rage incident where defendant hit

5

the victims' car, which led the victims to follow defendant and his codefendant to exchange insurance information. Defendant's codefendant swung a chain at one of the victims, and defendant got an automatic weapon and shot multiple times at the victims. The victims were unarmed and defendant used a firearm. Defendant claimed he used a BB gun but tested positive for gunshot residue, and there were shotgun shells on the floor of his car.

The prosecutor further argued the letters submitted by defendant's friends and family painted a picture of a highly capable, caring individual who was only depressed after being charged with these offenses. One of defendant's friends noted that defendant manages stressful situations well. The facts boiled down to credibility contest where the victims reported defendant and his friends were the aggressors and vice versa, but defendant's self-defense claim was undermined by his lying to police officers, as shown by their discovery of ammunition and firearms and his positive test for gunshot residue. These facts showed the defendant's initial claim of self-defense was unlikely to be successful, so he was now claiming his actions were motivated by a mental health disorder.

Lastly, the prosecutor argued defendant was a danger to public safety if treated in the community, because his response to a traffic incident was to fire an automatic weapon multiple times in the victims' direction while his wife and daughter were present, which could have resulted in death or great bodily injury. Defendant's past crimes also were violent and dangerous, including a misdemeanor arson conviction and a domestic violence incident.

In ruling as to eligibility, the trial court noted that the nexus between the crime and defendant's mental disorder is presumed and the prosecution must show by clear and convincing evidence that it was not a factor. Given this was a "very factually disputed case," the court said it could not without more evidence find by clear and convincing that

6

a mental health disorder was not a significant factor or contributing factor in these offenses.

As to suitability, the trial court found defendant not suitable because of the risk to public safety as defined in section 1170.18 if he were treated in the community. The court acknowledged the similarity of this case to *Whitmill* but distinguished that case because multiple shots were fired in this incident and there were allegations that automatic weapons were used. Also acknowledging that this proceeding was not a preliminary hearing or trial and there were credibility issues on both sides, the court evaluated the police reports and noted that officers located a rifle and a shotgun despite defendant's denials that he had firearms. Therefore, even though defendant had been released for two years and was doing well on his current program, the court found defendant an unreasonable risk if treated in the community.

In March 2025, defendant pled no contest to count six, unlawful possession of a firearm. The remaining charges were dismissed with a waiver pursuant to *People v. Harvey* (1979) 25 Cal.3d 754. The trial court suspended defendant's sentence for two years, placed him on formal probation, ordered him to serve 270 days in county jail.

Defendant filed a timely notice of appeal.

## DISCUSSION

Defendant contends the trial court's finding that he posed an unreasonable risk of danger if he received treatment in the community was an abuse of discretion, because the court, in its stated reasons for distinguishing *Whitmill* and denying diversion, "applied the wrong definition of 'suitability.'" We find no abuse of discretion.

Section 1001.36 requires a two-step review for pretrial diversion petitions. (§ 1001.36, subds. (b), (c).) First, the trial court must find a defendant eligible for pretrial diversion if: (1) the defendant has been diagnosed with a qualifying mental disorder; and (2) the defendant's mental disorder was a significant factor in the commission of the charged offense. (*Id.*, subd. (b).) We need not discuss this first step further, because the

7

trial court found defendant eligible but not suitable for mental health diversion. At issue here is the second step, suitability for diversion. (*Id.,* subd. (c).)

A defendant is suitable when, among other requirements, he will not pose an "unreasonable risk of danger to public safety" if treated in the community. (§ 1001.36, subd. (c)(4).) An "unreasonable risk of danger to public safety" is defined as "an unreasonable risk that the [defendant] will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." (§ 1170.18, subd. (c).)

As relevant here, "[t]he violent felonies encompassed in this definition 'are known as "super strikes" and include murder [and] attempted murder ....' " (*People v. Moine, supra,* 62 Cal.App.5th at p. 449. "In determining the risk of danger, section 1001.36 contemplates the trial court will consider the opinions of the district attorney, the defense, and qualified mental health experts, as well as the defendant's violence and criminal history, the current charged offenses, and any other factors the court deems appropriate." (*Id.* at p. 451; § 1001.36, subd. (c)(4).)

"A trial court's ruling on a motion for mental health diversion is reviewed for an abuse of discretion, and factual findings are reviewed for substantial evidence. [Citations.] A trial court has 'broad discretion to determine whether a given defendant is a good candidate for mental health diversion.' [Citation.] 'A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citation], or bases its decision on express or implied factual findings that are not supported by substantial evidence.' " (*Whitmill, supra,* 86 Cal.App.5th at p. 1147.) The fact that reasonable minds may differ as to the appropriate resolution of an issue does not signal an abuse of discretion. (*People v. Clair* (1992) 2 Cal.4th 629, 655.) It is the defendant's burden to establish abuse of discretion. (*People v. Pacheco* (2022) 75 Cal.App.5th 207, 213.)

While defendant contends the trial court applied the wrong definition of suitability, the definition the court recited at the hearing essentially repeated the statutory definition, i.e., "does someone pose [an] unreasonable risk to public safety as defined in [s]ection 1170.18 if treated in the community." (§ 1001.36, subd. (c)(4).) Defendant appears to be arguing that the trial court erred in relying on the police reports and in never making an express finding that defendant was likely to commit a super strike.

As to the first point, the diversion statute provides that in deciding whether a defendant poses an unreasonable risk of danger to public safety, the "court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, *and any other factors that the court deems appropriate*." (§ 1001.36, subd. (c)(4), italics added; see also *People v. Graham* (2024) 102 Cal.App.5th 787, 795-797 [court may consider relevant and credible evidence in denying mental health diversion].) Here, the police reports provided context for the charged offenses, and the statute did not prohibit their consideration. Moreover, the trial court did not rely on everything police reported, acknowledging competing versions of the facts, and focused on reports by not only the victims but also third-party witnesses that multiple shots were fired, possibly by automatic weapons, and police located firearms in defendant's home after he denied having any guns.

Nonetheless, defendant claims the trial court applied an erroneous standard of suitability in distinguishing *Whitmill*. Defendant quotes *Whitmill* that "[t]he court 'must treat the matter as if the charges against the defendant have not yet been adjudicated; the court is not sentencing the defendant,' " which *Whitmill* in turn quoted from a footnote in *People v. Qualkinbush* (2022) 79 Cal.App.5th 879, 892, fn. 11. (*Whitmill, supra,* 86 Cal.App.5th at p. 1149.) Defendant argues the record shows the trial court "did not 'treat the matter as if the charges against the defendant have not yet been adjudicated[].' " To the extent defendant argues the court must treat the charges as unproven, nothing in

9

the statute or caselaw precludes the trial court's consideration of all the information before it, including police reports, to determine whether defendant presented a risk to public safety. (§ 1001.36, subd. (c)(4).) Moreover, the court in *People v. Qualkinbush* made this comment in the context of its conclusion that "the general sentencing objectives of the criminal justice system as articulated in [California Rules of Court] rule 4.410 had no application to [the defendant] and do not provide a proper basis for denying [a] motion for diversion." (*People v. Qualkinbush, supra,* at p. 892, fn. 11.) In *People v. Qualkinbush,* the court found that the trial court erred in relying on this rule in finding the defendant unsuitable for mental health diversion.[5] (*People v. Qualkinbush,* at pp. 890-892.) The trial court did not rely on rule 4.410 here.

As to the second point, the statute does not require that the trial court make an express finding that the defendant is likely to commit a super-strike offense. Section 1001.36 does not mention express findings, orally on the record or in writing. Section 1001.36 merely specifies the suitability criteria "the court must *consider*," such as whether "[a] defendant . . . pose[s] an unreasonable risk of danger to public safety, as defined in [s]ection 1170.18, if treated in the community." (§ 1001.36, subd. (c)(4).) Under the general doctrine of implied findings, we must imply all findings in favor of the trial court's order, including an implied finding that defendant was likely to commit a super-strike offense. (See *People v. Moine, supra,* 62 Cal.App.5th at p. 451 [analyzing

---

[5] California Rules of Court, rule 4.410 provides that "(a) General objectives of sentencing include: [¶](1) Protecting society; [¶] (2) Punishing the defendant; [¶] (3) Encouraging the defendant to lead a law-abiding life in the future and deterring him or her from future offenses; [¶] (4) Deterring others from criminal conduct by demonstrating its consequences; [¶] (5) Preventing the defendant from committing new crimes by isolating him or her for the period of incarceration; [¶] (6) Securing restitution for the victims of crime; [¶](7) Achieving uniformity in sentencing; and (8) Increasing public safety by reducing recidivism through community-based corrections programs and evidence-based practices.

10

whether substantial evidence supported implied finding that defendant was likely to commit a super strike offense]; *People v. Williams* (2021) 63 Cal.App.5th 990, 1003 [same].)

Lastly, defendant argues that no substantial evidence supports that defendant is at risk of committing a super strike, given that defendant was released from custody for two years before the hearing and granted probation five months after the hearing. At the hearing, the trial court noted it can consider how long a defendant has been out of custody but concluded release on bond is a different analysis from the analysis applied on an application for mental health diversion. We conclude the trial court did not abuse its discretion.

The leading case on this issue is *People v. Moine, supra,* 62 Cal.App.5th 440, where the appellate court said the trial court's decision to release the defendant for two years into the community on bond indicated the court found defendant was not likely to cause great bodily injury if released, which is "logically inconsistent" with denying mental health diversion because the defendant was likely to commit a super strike. (*Id.* at p. 451.) *People v. Moine*, however, is distinguishable on its facts. In that case, the defendant got into a fistfight with another patient at an urgent care facility and a year later threatened to shoot an urgent care worker, after which he apologized profusely. (*Id.* at pp. 444-445.) There was no evidence that the defendant had a firearm, let alone used one in the charged offense. Here, defendant fired multiple shots over the heads of the unarmed victims who followed him home to obtain insurance information after a minor traffic incident and then falsely told police he did not have any firearms. This constitutes substantial evidence of an unreasonable risk that defendant was likely to commit a super-strike. Additionally, while defendant was granted formal probation, probation provided greater supervision than treatment through mental health diversion. (See *People v. Pacheco, supra,* 75 Cal.App.5th at p. 214.)

11

On reply, defendant relied on *Gomez v. Superior Court* (2025) 113 Cal.App.5th 671, where the reviewing court concluded the trial court's determination that the defendant presented a risk of danger was not supported by substantial evidence. (*Id.* at pp. 689-690.) The court noted that defendant had no criminal history and thus had not previously been charged with a super strike offense, was not currently charged with a super strike, and had been out in the community for a year with no new charges filed against her. (*Id.* at p. 690.) As a threshold matter, comparing rulings from different cases is of "limited utility" because "each case necessarily depends on its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.) Here, our facts are different. In *People v. Gomez,* a robbery victim was struck by a metal object wielded by another assailant, and the victim reported the defendant saying, "get his ass, kill his ass." (*Gomez,* at p. 680.) The offense did not involve a firearm, and the defendant did not personally hit the victim. (*Id.* at p. 690 [no evidence or argument that "Gomez ever touched the victim"].) While prior and current offenses are relevant to assessment of risk, we consider foremost the "*circumstances* of the charged offense" in assessing risk. (*People v. Bunas* (2022) 79 Cal.App.5th 840, 861.) Here, defendant's actions in firing multiple times over the heads of the victims showed his capability and readiness to engage in particularly dangerous behavior.

In sum, the record supports the trial court's finding that defendant posed an unreasonable risk of danger to the public. While reasonable minds may differ, and there was evidence supporting a different conclusion, the court did not abuse its discretion in denying defendant's request for mental health diversion.

## DISPOSITION

The judgment is affirmed.

/s/
MESIWALA, J.

We concur:

/s/
EARL, P. J.

/s/
MAURO, J.

13